May it please the court, counsel. I'm Matthew Newman, I represent the appellant and plaintiff Maryanne Thiry. I won't repeat everything that's in my briefs. The essential argument here from our standpoint is that Ms. Thiry presented a lot of evidence, a lot of evidence supporting her functional limitations and inability to work in any occupation. This in the fibromyalgia case, but there was a lot of comorbid conditions, was the disability was the result of pain, fatigue, cognitive issues, and it was supported by her subjective testimony, which is almost always going to be the case. It's got to be the case in a pain and fatigue case especially. There really is no other way to produce evidence of functional limitations except through subjective testimony. And the question has got to be, well at what point does subjective testimony, should it be believed? What is the credibility of a plaintiff? And in an ERISA case, we don't have live witnesses. There is no cross-examination. It's a different, we're just not allowed to bring experts into court. And that's something that we dealt with before the magistrate judge, before she issued her report and recommendation. So we have the subjective testimony and she presented evidence of limitations, substantial evidence. The record is voluminous. We spent a lot of time at the administrative level building up that evidence. And I don't mean building it from a manufacturer standpoint. These were interviews that were conducted by myself with my client. And really didactically, carefully going into every aspect of her life. What's it like to wake up in the morning? What's it like to fight through the day on top of fatigue? It's not that she didn't sleep and all sleep was an issue. It's like how do you operate on top of an unrelenting fatigue that alters your performance, that alters your personality? And that is well set out in the briefs. Well counsel, I want to ask you, you don't make the point that the plan has to accept the subjective testimony. Because my understanding of ERISA law is that the plan can do its own independent investigation, figure out sort of whether the claims are true or not. And that's kind of what they did here. So I'm trying to figure out what exactly your problem is. Yeah. Thank you. Well the problem is the question is how does an ERISA plaintiff, how is that person going to be believed? So what we did in this case is very carefully prepared a terrific amount of clinical evidence. And clinical evidence is, and this is one of the reasons why I'm respectfully urging the court to begin to clarify in this area, there are three different types of evidence. They're really distinct. One is subjective evidence. And I understand that the insurance companies and the fiduciaries in ERISA cases have the right to look at the subjective testimony, question it. Does it match? Are there, is there any contraindications to the subjective testimony? For example, some insurance companies many times surveil clients to look and see, does this really match, does the functional limitations really match what she's saying they are in her life? There are, there is credibility analysis that you could do, but it was never asked for, never requested by United in this case. There's credibility scores that can be tested that look specifically at that. And again, that was never called for in this case, so we never responded to that. We didn't respond, so. Yeah, but you know, when you, when you look at, when you look at this, this is a little bit unusual, this case, because originally made, they made the determination that there was no disability. And then they, they reconsidered it and they said, look, we're going to make a judgment call here. We've looked at all the evidence that after making a judgment call, they said, we really think that there is a disability, but the disability is caused by depression and anxiety, and so it's subject to our mental disorders provision in the plan. We just don't think it's, it's, it's the fibromyalgia. While she may well have it, they don't dispute that, that, that she has it. Ultimately, that, that's not what, what's causing the disability. The causal factor is the, is the depression and anxiety. And so that seems like a judgment call that the, that the plan is entitled to make. Am I wrong about that? Well, they can make that, but the argument that we presented to them consistently throughout the appeal and in litigation was that the depression and anxiety was secondary to the pain and fatigue. You know, when you, if you were ever in the unfortunate situation, or if you know anybody who's in the unfortunate situation of somebody with this condition, they're, again, they're, you have to, if you picture people, somebody operating on top of the fatigue, it's different than a loss of sleep. It's an unrelenting fatigue. It's almost like the experience that I've had sometimes if I'm driving late at night and it's almost, it's painful to be awake and you have to stay awake, but it's painful to do that. So if you're going to perform an occupation on top of this unrelenting fatigue, which is the best way I can describe it as painful, I don't suffer from that. But I know a lot of people do. Then... What relevance is there though that, to the fact that, you know, and I think there's some of this in the record, but fibromyalgia and depression are very closely associated with one another and often are mistaken one for the other. And sometimes even, from what I understand, fibromyalgia is treated with depression medication as one of the elements of treating fibromyalgia. What is the relevance of that to this particular case, if any? In this case, there's no relevance and that's based on Eighth Circuit law, Your Honor. The, and the reason for that is that in our diagnosis, when the standard trigger point test is done, as it was in this case, the, so when that diagnosis is determined, then you have fibromyalgia. It's not, it's distinct from depression. The question then becomes, can become, and we presented it without rebuttal ever in this case. United has never rebutted it at the administrative level when we presented this, never at the, at the before the magistrate, and, and to this day has never rebutted it. We've claimed that the depression is secondary to the fibromyalgia. They found that Ms. Thiry was disabled based on those symptoms, but the symptoms are, are symptoms that are known to flow from fibromyalgia, as well as the other comorbid conditions that Doesn't the plan define mental disorder, any condition or disease regardless of its cause? Is that the way then the United can say, well, there is the, the mental health disorder. It doesn't matter the cause, and you're saying perhaps it's the cause is the fibromyalgia. I think that's arguable, Your Honor. The, the plan doesn't exactly say that. The definition of disability is it's caused by something, but the question then is what is it caused by? If it's caused, if the depression is caused by depression, that's one thing. That's a standard DSM 5 diagnosis. If it's caused by the fibromyalgia, that's some, that's another animal altogether. And so we, you then have, I'm sorry to interrupt, but then wouldn't, it seems then you're talking about two separate, almost separate diagnoses, the, the depression, which may qualify and did here for a mental disorder, but then the physical limitations that the United was requiring some kind of clinical proof that the physical limitations were such that there was no occupation or job that she could engage in. Yes. And in, in this case, this is the heart, in my view, this was the heart of the case. We thought that coming up at the district court level and through the appeal that you, that United had punted on the issue of clinical evidence. I was aware that clinical evidence would be critical in this case, which is why I, when I started this argument today, I'm urging this court to distinguish, to start to clarify, to really clarify the distinctions between the types of evidence that there are. Clinical evidence is by observation of a doctor based, who's treating a patient. That's what clinical evidence essentially means. It's defined in the brief. It's, so if you have clinical evidence and all of her treating doctors and therapists provided extensive support for this, if you have clinical evidence, that's we, our argument, your honor, is that that ought to be what is looked for to corroborate subjective testimony. That's ought to be one of the key indications or so if you have clinical evidence and there's three, at least three questionnaires to look at in this case that were prepared by me for doctors to fill out, but I didn't put words in the mouth ever. They provided narratives and they were clear that their patient, that this supported her claims that she had unrelenting fatigue, that she was in great pain, that she was dealing with cognitive issues and the medications that she was on, another point in this case that was never rebutted, you know, she has fibromyalgia, she has a prescription medication, very serious prescription medication like gabapentin, things that are neuro drugs that impact your ability to think and she, as the record shows, Ms. Thiry was constantly looking to, looking at how do I balance that. If I take the neuromedications, I just can't perform on the job. If I don't perform, take the neuromedications, I am in so much pain from my fibromyalgia that I can't even move. I can't get up. So there was a constant balance between do I take the medications today, do I not, but she had prescription medications. Again, something that was never addressed by the administrators or by the district court. Who was the, who was her treating physician? Dr. Campo. Now, what's the role of this Dr. Jagapraghasan? Dr. Jagapraghasan, I'm not sure how to pronounce that either, your honor. He saw her one time, very briefly. His role was, his role was to look to see, you know, she's, if you're this ill, you try to find doctors that can help you and that's, she went to somebody one time, a very short visit, and he came up with, he came up with what, the argument that he came up with. By the way, the... Well, he says, you know, there's this reviewer record of a telephone call or telephone conversation with this doctor who says, claimed it was seen once, was diagnosed with fibromyalgia. And then, this is kind of curious way of saying this, he says, that Dr. Jagapraghasan stated that they do not recommend disability for fibromyalgia. You know what that . . . Well, our argument before the district court, but that . . . Meaning never, they never, they never . . . That's how I read it, your honor. We'd never had any communication with Dr. Jackis-Saborian after that. Yes, that was our argument before the district court that that isn't saying that she doesn't have fibromyalgia. We just don't recommend disability for clients with fibromyalgia. And a number of clinics fail that way. The other thing to note, though, in this case is that the substantial evidence that we presented was never presented, the subjective evidence, the clinical evidence, the checklist, none of that was ever presented to Dr. Jackis-Saborian. So he based his, even if he said that fibromyalgia is not an appropriate disabling diagnosis for this patient, assuming arguably that's the case, he did not have evidence in front of him that we submitted on our appeal. That just was never provided to him. It came before in time that that evidence was even available. Thank you, your honor. Thank you. Okay, Mr. Brenner. Good morning. I'm Todd Brenner. I'm here on behalf of the Appalee defendants. There's a lot I could say here. Let me start with, I think, three or four of the major problems with Mr. Newman's position here. One is Dr. Jagatpragasin, I think is how you pronounce it. He was a rheumatologist that diagnosed Ms. Dheeri with fibromyalgia. When Dr. Becker spoke to him, he said he did not recommend disability. He didn't say she didn't have fibromyalgia. I think it's pretty clear from the record, and I think United has acknowledged this from the outset, that there is substantial evidence that Ms. Dheeri suffers from fibromyalgia. It's a question of whether it reaches the level of disabling from a sedentary position, which is another undisputed fact. What she did- How do we know what that short comment means? In a lot of areas, a lot of litigation involving disability calls, it's kind of a given that it's not the doctor's role to conclude whether there's disability. The doctor's role is to provide results of testing and to opine as to functional limitations, but not an ultimate question of disability. That short comment, when it talks about disability, and we don't recommend disability for fibromyalgia, it is a legal conclusion that maybe is not within the purview of a doctor. Is there something in the record that explains what he meant by that short statement? Only Dr. Becker's interpretation, and that comment's been interpreted several times now of Dr. Becker, who put it in his report. Dr. Becker's conclusion was, based on all the evidence he reviewed, that her level of pain, fibromyalgia, did not rise to the level of a disabling condition from a sedentary position, or occupation, sorry. It was interpreted by my client, it was interpreted by me, it was interpreted by Magistrate Judge Menendez and by Judge Thunheim to mean the same thing, which is that this particular rheumatologist did not think that she was disabled based upon what he knew, based on the evidence presented to him. And in these cases, Your Honor, I would say that it is not the role of doctors to make legal conclusions, whether a person is disabled under a disability policy or not. However, in a case such as this, you have subjective complaints, really, versus objective evidence. And the objective evidence that can be obtained by the claims administrator in these cases are from physicians. That's one key piece of evidence, I would argue. Another problem. Let me just clarify, at the beginning of our exchange there, you said that Dr. Jaga Sparogin was making a statement of no disability, did you say from a sedentary position? What was your, I didn't catch the words that you used, what were you saying there? I'm saying that Dr. Becker interpreted his phone conversation with Dr. Jaga Sparogin as meaning that. As meaning what? Say the phrase again so I can note it correctly. The quote was, did not recommend her for disability. And Dr. Becker in his report concluded that based on the evidence and based apparently upon that phone call, that she was not disabled. Dr. Becker was asked whether she was disabled from a sedentary work. Dr. Becker concluded that she was not. That the objective evidence did not verify that she was disabled from sedentary employment. I understand that, I just didn't understand what you said. Go ahead. The second point I would make is that in the case of Sako, I'm not sure how to pronounce that either, found no restrictions or physical limitations. And to Mr. Newman's point regarding fibromyalgia and the distinction between fibromyalgia and a mental disorder such as depression, I would say that they are absolutely distinct separate diagnoses. They are separate distinct conditions. Fibromyalgia is a physical disorder. I don't think there's any question about that. There may be some overlap in symptomology. But ultimately, fibromyalgia is a physical disorder and our nurse said in June 2005, there were no physical limitations or restrictions. Can you get a diagnosis of fibromyalgia without the corresponding mental health problems as well? Certainly. Certainly. I see it all the time. Without any kind of symptoms? I believe so. I've been doing this a long time. I've seen a lot of fibromyalgia cases and I've seen quite a few where there's no argument, there's no mention of a mental or nervous condition. Because it does seem to be a distinct type of problem or just disorder diagnosis because one, it is, its symptoms are in many ways subjective, pain, fatigue. And it does have, it seems, at least in a lot of situations and maybe you're correcting me that I'm wrong, a mental health component so that you're dealing with not just a broken arm or a physical limitation, but also a combination of what the physical limitations then lead into the mental health or vice versa. Yeah, there's certainly an overlap. You see that often, but not exclusively. Well, but for those segments of the population who have fibromyalgia and have the accompanying mental health issues that go along with them. And as I mentioned to opposing counsel, I think that antidepressants are often used to help with fibromyalgia, the physical symptoms. And so my question for you is, it's a little bit of a chicken and egg problem here from your position, which is, did the mental health come first and cause the disability or did the fibromyalgia sort of cause the mental health symptoms? Which one came first and which one is predominant here? It's really hard, based on what Judge Kelly is saying in particular, to figure out what the cause is here. I understand and I appreciate that position. I think though that here, there was a finding that she was depressed and she had severe anxiety, a position that changed from United. They referred it out to a second peer review. This doctor disagreed with the first doctor, said she has severe anxiety, severe depression. And disability benefits were paid for two years, okay? I think then though, after that, there was significant analysis of the physical limitations. And it was established, I think, by the evidence that on the basis of fibromyalgia, her pain, her disability didn't rise to the level of being disabled from sedentary work. And that's a key too, that she was in a sedentary position. I always make the analogy of the guy who operates the jackhammer versus the person who sits behind the desk. If this was a jackhammer operator, the results probably would have been different. So your viewpoint is even if the fibromyalgia may have caused the depression, the fact of the matter is the physical symptoms, the physical symptoms just didn't rise to the level of the disability. The only thing that we really know for sure is that the mental health symptoms gave rise to a disability, made her unable to work. I think that's a fair conclusion, based on the evidence. The other problem, I think, for Mr. Newman and Ms. Theory is the Eighth Circuit precedent that we have here. Not mentioned anywhere in Matt's briefs is the Eastman case, Eastman versus Prudential, which is a 2008 case from the Eighth Circuit. And I'll quote it, although the court may not agree with Prudential's decision that Eastman was not disabled due to fibromyalgia, Prudential's determination that Eastman was subject to the 24-month mental illness limitation was not an abuse of discretion. A reasonable person, given the evidence in the record, could have reached a similar decision. Therefore, Prudential is entitled to summary judgment on Eastman's ERISA claim. The point being that it's not necessarily whether the conclusion is correct, it's whether it's reasonable. The court could come to a different conclusion, but if the conclusion reached, in this case by United, was supported by substantial evidence and was reasonable, it can't be overturned. And that was the conclusion reached by Magistrate Judge Menendez and then ultimately by Judge Thunheim. In my view, they both correctly observed that United was seeking substantiation of Ms. Theory's disability. The policy ensures against disability. It doesn't ensure against illness. And for that reason, I think it was proper for United and it was proper for the district court to focus on those limitations and not necessarily the illness. It does seem like there's a particular challenge here in corroborating or verifying when so much of it comes from a subjective description of pain and fatigue. And as I understand it, no one has claimed that Ms. Theory is not a credible historian and no one has claimed that she's a malingerer in any way. I think that's a fair statement. And so how do you go about verifying that or corroborating that to a degree that satisfies United that these subjective descriptions are actually sufficiently severe to limit her physical abilities, functional abilities? Well, that's been a challenge in federal courts and it was a challenge in the 8th Circuit. I think Prelusky and I believe Eastman, and there's a case, I'm sorry, I should have mentioned this before, Green, the Green case decided in 2011 by this court, Green v. Union Security, 642 Fed 3rd, 1042. And in Green, the court discusses briefly this issue and what Matt brought up specifically, which is distinction between subjective, objective, I'm sorry, subjective, objective, and clinical evidence. And in my view, I think there's very little distinction between what we call objective and clinical evidence over here. And I think for purposes of ERISA and disability, they're pretty much the same. And the Green case talks about, in the FCE context, which is functional capacity evaluation, which sometimes disability claimants go, the insurance company pays for it or even the plaintiff pays for it, and it's an evaluation of their physical capacity. And in that context, Green, following other circuits, have lumped in objective and clinical evidence. It's kind of, excuse me, it's kind of one set of evidence. You have subjective and then you have everything else. To hopefully specifically answer your question, it is a struggle. You have to draw a line somewhere. If every claimant says, I hurt, therefore, I'm disabled, then every claim would be paid. So I would say this isn't a credibility issue as far as missed theory is concerned. This is subjective complaints versus objective evidence. You need verification of disability, not verification of illness or injury or condition. It's whether or not the person can perform the duties of his or her occupation. In this case, it's sedentary. What about the cognitive fog that they've described? Well, to that I would say that United reviewed this claim four times and their denial letters spanned 31 pages. And the record was 3,400 pages long. So I can also tell you that the objective medical evidence from the reviewing physicians didn't find that dispositive, didn't find it compelling. So I guess that based on the evidence that the cognitive fog and some of the other subjective symptoms that Matt has brought up don't rise to the level of impairment. In this case, did the administrator notify the appellant that her file lacked the required objective evidence? Yes. If you're able to, can you refer us to that communication? Well, I would refer you to page eight of magistrate judge Menendez's report and recommendation. The June 10, 2005 denial, United explained that it examines the medical evidence to determine the claimant's maximum work capacity. United advised that there were insufficient evidence of motor deficits, atrophy or reduction of involved muscle groups, things one would expect if her condition was incapacitating. The report and recommendation also talk about the policy requirements of proof of loss, which consists of clinical records, charts, x-rays and other diagnostic aids. I'm out of time, it looks like. All right. Thank you for your argument. Thank you. Mr. Newman. Take two minutes to answer. One of the questions the court should consider is what issue was looked at. Arguably pain was looked at. You can make that argument. We don't think so. We think this is a snippet of a 750 page record that we pared down for the court in our joint appendix. Pain, you can argue, was looked at because, well, there wasn't muscle atrophy and redness or joint effusion, things that I have no idea where there's support in any of the medical literature that that's somehow proof or disproof of a claimant having pain or the severity of pain. But assuming arguendo that that is so, there is nothing in the administrative record that goes to rebutting her claims of fatigue or cognitive fog or depression secondary to the fibromyalgia. And in the citation in our opening brief, I cite to standard medical literature that depression often is associated, is one of the conditions some patients, many patients have from fibromyalgia. But there was never, this was never challenged. In an abusive discretion case, this was something that we presented that was never addressed. And you can scour the administrative record to determine what type of notice was provided to Ms. Thierry regarding what it is that was in her proof was lacking. We put in about 50 pages or so of clinical evidence. We thought that was sufficient. And the distinction between clinical and subjective and objective is critical. I'm out of time, Your Honor. Thank you. Thank you, Counsel. Appreciate your arguments this morning. The case is submitted and we will render a decision in due course. And with that, you may stand aside. Please call the next case. Noelle McCaw v. Sarah Davidson. Alright. Mr. McCaw. Mr. Torbenen. Alright. We'll let everyone get set.